**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ROSEANN LOPEZ,** | ) | |
| | ) | **Case No. 10 CV 6515** |
| Plaintiff, | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Young B. Kim** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security** | ) | |
| **Administration,** | ) | **February 10, 2012** |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

Plaintiff Roseann Lopez seeks review of the final decision of the Commissioner of

Social Security ("Commissioner") denying her application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423(d)(2), and

Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C.

§ 1382c(a)(3)(A). Before the court are the parties' cross-motions for summary judgment.

Lopez asks the court to reverse the Commissioner's decision and award benefits, or in the

alternative, to remand the case for further proceedings. The Commissioner seeks an order

affirming the decision. For the following reasons, Lopez's motion for summary judgment

is granted insofar as it requests a remand and the Commissioner's motion is denied:

**I. Procedural History**

Lopez applied for DIB and SSI on August 6, 2007, alleging that she became disabled

on March 1, 2006, due to depression, mood swings, and insomnia. (Administrative Record

("A.R.") 50, 96-98, 101-03.) The Commissioner denied her applications on November 20,

2007, (id. at 46-50), and again on reconsideration on April 18, 2008, (id. at 53-60).

Thereafter, Lopez requested and received a hearing before an administrative law judge

("ALJ"). (Id. at 62.) On August 24, 2009, the ALJ issued a decision finding Lopez not

disabled. (Id. at 15-21.) The Appeals Council denied Lopez's request for review on August

10, 2010, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see*

*Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Pursuant to 42 U.S.C. § 405(g), Lopez

initiated this civil action for judicial review of the Commissioner's final decision. The

parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c).

## II.  Background

### A.    Summary of Medical Evidence

Lopez, who is 56 years old, has suffered from depression for more than 20 years.

(A.R. 25, 243.) In February 2006, a month before she stopped working, Lopez sought

treatment for her depression at Community Health Clinic. (Id. at 223-24, 255, 257.) She

reported having days when she feels normal and days when she feels very sad and upset for

no reason. (Id. at 223.) Lopez was prescribed Prozac, but by April 2006 she stopped taking

it because she feared its side effects, which include an increased risk of suicide. (Id. at 226.)

In lieu of taking Prozac, during the summer and fall of 2006 Lopez used art and music for

relaxation and relied on a "positive mental attitude" to manage her depressive symptoms.

(Id. at 227-28.) Lopez reported feeling better in the fall of 2006, (id. at 269), but by June

2007, Lopez's affect was flat and she displayed depressive symptoms, (id. at 273). Lopez

had some thoughts of suicide, which were "set off" by home stressors. (Id.) She reported feeling better when taking Prozac and agreed to take the medication again. (Id.) Lopez also explained that she was having difficulty finding a job. (Id.)

Lopez continued to seek treatment for her depression in the summer of 2007. She reported to a Community Health treating source[1] in July 2007 that she continued to have "some low mood," but her mood had improved after she restarted taking Prozac. (Id. at 276.) Lopez denied having active or passive suicidal ideation, stating that she "tr[ied] not to think about it." (Id.) Treatment notes reflect that Lopez only slept three hours each night, she had a flat and tearful affect, and she spoke at a slow rate with "some latency to respond." (Id. at 276-77.) In August 2007, Lopez's mood was a little better and she denied suicidal ideation, but she continued to have difficulty sleeping for longer than three to four hours at night. (Id. at 279.)

Lopez's sleeping problems continued into October 2007 and, as a result, she always felt tired. (Id. at 243.) Although she had some improvement on Prozac, she displayed a blunt affect, halting speech, fair to limited insight, limited judgment, and mild psychomotor retardation.[2] (Id. at 243-44.) At the time, she did not have any suicidal ideation. (Id. at 244.) The individual treating Lopez hypothesized in his or her notes that her depression likely has

---

[1] The record of who treated Lopez during her visits to Community Health is not clear.

[2] Psychomotor retardation involves "a generalized slowing of psychological and physical activity, frequently occurring as a symptom of severe depression." *See* http://dictionary.reference.com/browse/psychomotor+retardation (last visited Feb. 10, 2012).

"some biological component," but also documented that her 20-year history of depression stemmed from her childhood; she had an absent father and a verbally and physically abusive mother and stepfather. (Id. at 243-44.)

Lopez also underwent a psychiatric evaluation with Barbara Sherman, Psy.D., a state agency psychologist, in October 2007. (Id. at 192-95.) Lopez reported to Dr. Sherman that she suffered from a long history of depression and severe nightmares. (Id. at 192.) She explained that she was physically and emotionally abused as a child and sustained numerous head injuries, bruises, and lacerations during those years of abuse. (Id. at 192-93.) Lopez acknowledged feeling depressed, crying frequently, and experiencing some lethargy, withdrawal, and isolation from her peers. (Id. at 194.) During the evaluation, Lopez was dysphoric in appearance and tearful. (Id. at 193.) Although Lopez was distressed and worried about family problems, she denied any suicidal ideation or manic episodes. (Id. at 194.) But she reported having auditory and visual hallucinations, which take the form of feeling like she is being followed and thinking that someone is questioning her. (Id.) The hallucinations began 15 years earlier when her six-year old daughter was kidnapped and sexually abused by a teenage neighbor. (Id.) During the evaluation, Lopez displayed a diminished attentional focus, but her memory, conceptual ability, reasoning, and judgment appeared adequate. (Id.) Dr. Sherman diagnosed Lopez as having major depression with psychotic symptoms, and post-traumatic stress disorder ("PTSD"). (Id.)

4

In November 2007, David Gilliland, Psy.D., also a state agency psychologist, reviewed Lopez's medical file and completed forms assessing her mental ability to perform work-related activities. (Id. at 196-213.) Dr. Gilliland diagnosed Lopez with a depressive disorder and an anxiety disorder. (Id. at 199, 201, 212.) In assessing the degree of her functional limitations, Dr. Gilliland found that Lopez has mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Id. at 206.) He noted that Lopez reported in an Activities of Daily Living Questionnaire that she was forgetful, afraid of people, overly sensitive to people's remarks, and easily upset when criticized. (Id. at 208.) Based on his review, Dr. Gilliland assessed Lopez as moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; and (3) interact appropriately with the general public. (Id. at 210-11.) He opined that Lopez is mentally able to perform simple repetitive tasks, but that she must have limited contact with the general public. (Id. at 212.)

Lopez continued to seek treatment for her depressive symptoms from November 2007 to December 2008. Toward the end of November 2007, Community Health treatment notes indicate that Lopez was doing well on Prozac. (Id. at 285.) A month later, Lopez was "visibly upset" recalling a stressful interaction with a man on a bus who recently threatened to attack her, but she also reported that Prozac "helps" and that her mood had been "good." (Id. at 285-86.) In April 2008, Lopez denied having any complaints; in May, she said her

mood was stable and she denied having suicidal ideation; and in August, her depression had "improved on Prozac." (Id. at 289-90, 292.) In the fall of 2008, Lopez reported that her concentration, appetite, and energy were normal and she denied suicidal ideation. (Id. at 292.) But Lopez reported sleeping only about five hours each night and she cried when relating memories of her daughter being kidnapped. (Id.) Her thought process was generally linear with some tangential dimensions and her insight was poor to fair. (Id. at 293.) In November 2008, Lopez denied having depressive symptoms and said that her mood was "ok, not depressed." (Id. at 294-95.) But a few weeks later, Lopez reported being upset because the friend she lived with lost his job and she was concerned that she would become homeless. (Id. at 296.) Treatment notes reflect that Lopez was stressed, depressed, and crying. (Id.)

In December 2008, Lopez underwent a mental health assessment at Cicero Family Service and Mental Health Center. (Id. at 324-31.) Lopez reported that her symptoms were worsening and that she experienced random suicidal ideation, but she "has not thought about [suicide] for months and usually engages in leisure activities to take her mind off of those thoughts." (Id. at 324, 326.) She expressed feeling overwhelmed from the process of packing to move out of her friend's house. (Id. at 324.) Lopez relayed her history of being physically and verbally abused by her mother when she was a child. (Id.) She also described difficulty sleeping and feeling hopeless. (Id. at 330.)

Lopez's mental status examination indicated that she had an impaired memory, an inappropriate affect, an anxious and fearful mood, a history of hallucinations, and distractible

6

attention.  (Id. at 329.)  During the evaluation, Lopez had poor eye contact, took several

minutes to speak after a question was asked, and laughed during sad moments of her

presentation.  (Id.)  She also reported "seeing something" in her home three months earlier

that she knew was not really there.  (Id.)  The examiner assessed Lopez as having a Global

Assessment of Functioning ("GAF") score of 49[3] and displaying a "serious impairment in

social, occupational or social functioning."  (Id. at 330, 332.)  The examiner also diagnosed

Lopez with a recurrent major depressive disorder (moderate) and referred her for a

psychiatric evaluation and individual therapy.  (Id. at 330-31.)

In February 2009, Lopez underwent a psychiatric evaluation with Dr. Raymond

Gouttama, a psychiatrist.  (Id. at 335-36.)  He noted that Lopez's depressive symptoms

included sadness, crying, and insomnia.  (Id. at 335.)  A mental status examination indicated

that Lopez had fair memory, insight, and judgment, normal thought processes, no psychosis

or suicidal ideation, and low average intelligence.  (Id.) Dr. Gouttama diagnosed recurrent

major depression (moderate), prescribed Lexapro,[4] and recommended individual therapy.

(Id.)

---

[3]  The GAF includes a scale ranging from zero to 100, and is a measure of an individual's "psychological, social, and occupational functioning."  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) ("DSM-IV-TR").  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

[4]  Lexapro is used to treat anxiety and major depressive disorders in adults.  *See* http://www.drugs.com/lexapro.html (last visited Feb. 10, 2012).

In the spring of 2009, Lopez underwent therapy for her depressive symptoms.  (Id. at 338, 342.)  March 2009 progress notes indicate that Lopez seemed to be very susceptible to stress, which worsened her depressive symptoms.  (Id. at 338.)  Her treatment included creating a plan to address those things that trigger stress as well as exploring family dynamics in greater depth.  (Id.)  About a month later, in April 2009, Lopez's mood was ambivalent, but she was comfortable discussing her family problems, which were a significant source of her stress.  (Id. at 342.)  She continued to work on a plan to deal with her major stressors. (Id.)

**B.      Lopez's Testimony**

At the hearing before the ALJ, Lopez described the multiple limitations she believes interfere with her ability to work.  Lopez first explained that on an average day she typically takes a long walk early in the morning and then reads or watches television for the rest of the day.  (A.R. 31-32.)  She has difficulty remembering what she reads and must take notes during telephone conversations because otherwise she forgets what was said.  (Id. at 32.) Lopez described being afraid to go out of her house after her early morning walks because she fears someone will hurt her.  (Id.)  She has resorted to carrying a solid steel piece of fence that is "very pointed" to protect her against potential threats.  (Id. at 32-33.)  Lopez described recently sitting in a hospital waiting room and feeling like she had to be careful because the people around her looked like they were evil and would harm her.  (Id. at 33.)  She explained

that she has both good and bad days, but she becomes easily upset and paranoid after listening to the news on the radio or hearing about bad things. (Id. at 34-35.)

Lopez testified that she most recently worked as a janitor in March 2006. (Id. at 26-27.) She stated that her fear of other people affected her ability to work because she mistrusted her co-workers and believed that some people were always trying to put her down. (Id. at 33.) Her mistrust and fear of her co-workers caused her to hide from them every day because she did not want anyone to see her upset or crying. (Id.) Lopez described being unable to work because she would "mess up" due to her propensity to forget things. (Id. at 35.) She believes that her inability to work is also undermined by her sleeping and hygiene issues. Lopez explained that she has difficulty sleeping and needs to walk around for an hour each night, making her feel fatigued during the day. (Id. at 34.) She also often forgets to bathe for three or four days and only remembers to take a shower when her skin itches. (Id.)

## C. Medical Expert's Testimony

Larry Kravitz, Ph.D., a licensed clinical psychologist, was present for Lopez's testimony and discussed Lopez's ability to work based on his examination of the medical record. Dr. Kravitz explained that the medical records indicate that Lopez has a moderate degree of depression, some tangential association at times, a very subdued quiet feeling, and feelings of isolation. (Id. at 36.) Despite these ailments, Dr. Kravitz testified that Lopez's mental illness does not meet any listed impairment. (Id. at 30.) However, he opined that she

has a moderate restriction in activities of daily living, a moderate restriction in social functioning, and a moderate restriction in concentration, persistence, and pace, but no episodes of decompensation. (Id. at 35.) Dr. Kravitz determined that Lopez would be limited to the following: (1) short and simple instructions; (2) brief and superficial contacts with coworkers and supervisors; and (3) ordinary levels of work stress. (Id. at 36.) He added that because Lopez's symptoms "wax and wane to some degree," a question remains as to whether she can "sustain [work] eight hours a day, five days a week on an extended basis." (Id.)

When questioned by Lopez's attorney, Dr. Kravitz explained that, during those periods when Lopez experienced depressive episodes, Lopez might have difficulty showing up for work. (Id. at 36-37.) He also testified that Lopez would have difficulty handling criticism from a supervisor and that she would work best in a consistent, predictable environment where she did the same work each day and would not be likely to make many mistakes. (Id. at 37.) Dr. Kravitz further opined that even if Lopez made a small mistake, she might get upset and need to take a break from work to calm herself. (Id.)

## D.    Vocational Expert's Testimony

James Breen testified that Lopez's past relevant work as a janitor constituted unskilled and medium-level work. (Id. at 28.) The ALJ asked Breen to identify examples of medium-level and unskilled jobs that an individual with Lopez's age, education, and work experience can perform, but with additional limitations of short simple instructions, brief and superficial

10

contact with coworkers and supervisors, and work that has ordinary levels of stress. (Id. at 37-38.) Breen answered that Lopez could perform her past work as a janitor because the work is routine in nature and she would have only superficial contact with her coworkers as long as she was able to do the job. (Id. at 38.) He recommended that Lopez work at night in empty office buildings and factories because she would have less contact with the public and her coworkers. (Id. at 38-39.) Breen further stated that Lopez could perform warehouse and production assembly jobs. (Id. at 39.) However, he qualified that these positions would not be available if she were off task more than 10 percent of the time and had more than 10 to 12 absences per year. (Id.) Nor could a person who is absent more than twice each month remain employed. (Id. at 40.) Furthermore, if an individual could not handle simple criticism or take direction from her supervisor and needed to take an unscheduled break because she was upset and crying, there would be no work available for her. (Id. at 39-40.)

E.    **The ALJ's Decision**

The ALJ evaluated Lopez's claim under the required five-step analysis. *See* 20 C.F.R. §§ 404.1520, 416.920. He concluded that: (1) Lopez had not engaged in substantial gainful activity since March 1, 2006, the alleged onset date of her disability; (2) her depressive disorder constitutes a severe impairment; (3) this impairment does not meet or equal a listed impairment; (4) Lopez has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but is limited to short and simple instructions, brief and

superficial contacts with coworkers and supervisors, and ordinary levels of work stress; and (5) based on this RFC she can perform her previous work as a janitor.

The ALJ first noted that Lopez has had limited mental health treatment and has never been hospitalized for depression. (A.R. 19.) He found Lopez's testimony regarding her limitations not credible because she lived with a male friend and she cooked and cleaned for him in exchange for a place to live. (Id.) The ALJ further discredited Lopez's testimony because her interests included walking in the park and reading books, and because she reported that her concentration, appetite, and energy were normal. (Id.) He agreed with Dr. Kravitz's assessment that Lopez could perform work activity limited only by her need for short and simple instructions, brief and superficial contacts with coworkers and supervisors, and ordinary levels of work stress. (Id. at 20.) The ALJ noted that Dr. Kravitz's opinion was consistent with the medical evidence of record and took into account Lopez's subjective assessment of her functioning. (Id.) For these reasons, the ALJ concluded that the medical evidence did not corroborate Lopez's claimed limitations.

## II. Analysis

Lopez challenges several aspects of the ALJ's decision in her motion for summary judgment. Lopez first argues that the ALJ's RFC finding is not supported by substantial evidence because he failed to consider highly relevant pieces of medical evidence and ignored significant portions of Dr. Kravitz's and Breen's hearing testimony. Next, she claims that the ALJ improperly relied upon Dr. Kravitz's opinion rather than the opinions of

her treating physicians in finding that she was not disabled. Lopez then argues that the hypothetical question posed by the ALJ to Breen was flawed because it did not incorporate all of her limitations. She further argues that the ALJ made inappropriate assumptions that were not supported by the record and played doctor when he offered his own independent medical opinion. Lastly, Lopez asserts that the ALJ failed to consider the aggregate effect of her impairments.

This court must confine its review to the reasons offered by the ALJ, *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)), and determine whether the ALJ's decision is supported by substantial evidence, *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This court may not reevaluate the facts, reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). However, where the Commissioner commits an error of law, and the error is not harmless, the court must reverse the decision regardless of the evidence supporting the factual findings. *Id.*

A.    **RFC Finding**

Lopez first argues that the ALJ failed to adequately substantiate the RFC finding because he did not consider all of the evidence relevant to this determination. (R. 21, Pl.'s

Mem. at 8-13.) She contends that the ALJ failed to account for important aspects of her medical history and failed to address certain portions of Dr. Kravitz's and Breen's hearing testimony. (Id. at 9-13.) Lopez next generally asserts that the ALJ erred in concluding that limiting her to routine activities would compensate for her attentional or concentration difficulties. (Id. at 16.) The Commissioner counters that the ALJ considered the relevant evidence when he made his RFC assessment and properly concluded that Lopez was capable of performing her past relevant work as a janitor. (R. 23, Def.'s Mem. at 5-13.) The Commissioner also argues that Lopez misstates, misquotes, and mischaracterizes much of the record in her motion for summary judgment. (Id. at 5-15.) This court agrees that there are a number of instances in which Lopez exaggerates the record—for instance, in making unsupported references to the "increasing" thoughts of suicide and hallucinations—but for the reasons described below, this court determines that she correctly asserts that the ALJ committed reversible error in assessing her RFC.

The ALJ's central error in assessing Lopez's RFC was his failure to analyze all of the relevant evidence in determining that Lopez could maintain employment despite the evidence predicting her frequent absenteeism. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R.

14

§§ 404.1545(a)(3), 416.945(a)(3).  According to SSA regulations, the ALJ must do more than

simply list or acknowledge the relevant evidence as instructed here:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g.,
> laboratory findings) and nonmedical evidence (e.g., daily activities,
> observations).  In assessing RFC, the adjudicator must discuss the individual's
> ability to perform sustained work activities in an ordinary work setting on a
> regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an
> equivalent work schedule), and describe the maximum amount of each work-
> related activity the individual can perform based on the evidence available in
> the case record.  The adjudicator must also explain how any material
> inconsistencies or ambiguities in the evidence in the case record were
> considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7.  Although an ALJ is not required to discuss every piece

of evidence, he must consider all of the evidence that is relevant to the disability

determination and provide enough analysis in his decision to permit meaningful judicial

review.  *Clifford v. Apfel*, 227 F.3d 863, 870-71 (7th Cir. 2000); *Young*, 362 F.3d at 1002.

In other words, the ALJ must build an "accurate and logical bridge from the evidence to [his]

conclusion."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (citation omitted).

Here, in formulating the RFC, the ALJ based his finding on the testimony of the

medical expert, Dr. Kravitz.  After Dr. Kravitz testified that Lopez has moderate restrictions

in concentration, persistence, and pace, the ALJ asked him to explain how Lopez's

"psychiatric impairment" would limit her ability to function in the work place.  (Id. at 35-36.)

Dr. Kravitz testified that Lopez suffers from a moderate degree of depression and feelings

of isolation, but said that her impairment could be accommodated by short and simple

instructions, brief and superficial contacts with coworkers and supervisors, and ordinary levels of work stress. (Id. at 36.) However, Dr. Kravitz clarified that because Lopez's symptoms "wax and wane to some degree," it is unclear whether she can "sustain [work] eight hours a day, five days a week on an extended basis." (Id.) For example, Dr. Kravitz testified that during those periods when Lopez experienced depressive episodes, she might have difficulty showing up for work or handling criticism from a supervisor, and she would work best in a consistent, predictable environment where she did the same work each day and would not be likely to make many mistakes. (Id. at 36-37.) He explained that even if Lopez made a small mistake, she might get upset and need to take a break. (Id. at 37.) Thus, Dr. Kravitz specifically left open whether Lopez has the ability to work 40 hours a week or on a consistent basis.

The ALJ neither pressed Dr. Kravitz to answer that open question during the hearing nor resolved the issue in his decision evaluating Lopez's RFC. That gap in the analysis is particularly problematic because Breen testified that there would be no work available if Lopez had more than 10 to 12 absences a year, or more than two absences per month, or if she needed to take unscheduled breaks that take her away from her work. (Id. at 39-40.) Here, the ALJ committed reversible error in failing to discuss this testimony because it calls into question Lopez's ability to sustain full-time work. *Cf. Bjornson v. Astrue*, — F.3d —, 2012 WL 280736, at *3 (7th Cir. Jan. 31, 2012) (noting that the ALJ did not resolve the issue of whether there were any jobs the claimant could perform if she needed to take a break from

16

her workday at irregular intervals each day to lie down or if she missed more than two days of work).

The Commissioner's defense of this aspect of the ALJ's decision relies on precluded post-hoc rationalizations. Here, the Commissioner asserts that the ALJ did not include absenteeism or a need for unscheduled breaks in the RFC because Lopez averages less than one depressive episode a year. (R. 23, Def.'s Mem. at 9-10.) But the ALJ never articulated this reason in his analysis and the medical record does not support the Commissioner's after-the-fact contention. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). The record establishes that Lopez has experienced consistent depression for more than 20 years even though her symptoms have waxed and waned. For example, Lopez has displayed a blunt affect, halting speech, low mood, hopelessness, episodic crying, suicidal ideation, difficulty sleeping, hallucinations, diminished attentional focus, and anxiety. (*See e.g.*, A.R. 194, 223, 243-44, 273, 276-77, 279, 296, 324, 326, and 330.)

Lopez next persuasively argues that there are several important aspects of her medical history that the ALJ failed to consider in developing her RFC, including her diagnosis of PTSD, "increasing" thoughts of suicide, "increasing" audible and visual hallucinations, and low GAF score. (R. 21, Pl.'s Mem. at 9-11.) Although this court agrees with the Commissioner that Lopez mischaracterizes much of the record evidence—for especially

Lopez's repeated reference to several of her symptoms as "increasing" over time when the record does not support that characterization—this court's review of the record shows that the ALJ failed to do more than simply list several important aspects of the relevant evidence in the background section of his opinion. He did not explain how the RFC accommodates Lopez's PTSD or accounts for her random suicidal ideation and hallucinations. That lack of analysis casts doubt on whether the ALJ's determination that her depression is not disabling is supported by substantial evidence.[5]

The ALJ also failed to discuss Lopez's GAF score, which is indicative of a serious impairment; one that would prevent Lopez from functioning in most social, occupational, or school environments. *See* DSM-IV-TR at 34. Lopez was assigned a GAF score of 49 in December 2008, and that is the only GAF assessment available in the record. (A.R. 330, 332.) Nowhere in his assessment of Lopez's RFC does the ALJ explain how his conclusion is consistent with the assigned GAF score. In fact, the ALJ did not mention her score anywhere in the analysis. Even though the ALJ is not bound by the GAF score in assessing extent of Lopez's disability, *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010), the GAF score is one more piece of highly relevant evidence that the ALJ should not have ignored in

---

[5] Lopez has not persuaded this court that the ALJ's failure to discuss the biological aspect of her depression or the abuse that led to her PTSD requires reversal. The focus of this court's inquiry is on the limitations that stem from her depression and whether those limitations impede work-related activities, not the cause of her impairments. *See Bjornson*, 2012 WL 280736, at *1 (noting that the cause of a disability is irrelevant to the benefits determination).

assessing Lopez's RFC. Given the ALJ's omission of other relevant lines of evidence, his failure to consider and discuss Lopez's GAF score is yet another indication that the ALJ improperly overlooked key evidence in formulating Lopez's RFC.

Lopez further argues that the ALJ erred in his RFC assessment because he failed to consider the combination of all of her mental impairments, which include major depression with some psychotic features, anxiety, PTSD, a history of hallucinations, poor affect, impaired memory and concentration, slow speech, distractible attention, and a fearful mood. (R. 21, Pl.'s Mem. at 18-19 & n. 9.) As Lopez correctly points out, the ALJ must "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. The ALJ is required to undertake this analysis because the combination of a claimant's impairments "might well be totally disabling" even if each of the claimant's impairments standing alone is not serious. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011). Here, the ALJ's cursory analysis does not give this court confidence that he gave appropriate consideration to the combined effects of Lopez's depression and her other impairments. Nor does the ALJ's incorporation of Dr. Kravitz's opinion serve as a stand-in for an analysis of the combined impact of Lopez's conditions. Although Dr. Kravitz described Lopez's psychiatric impairment as including a moderate degree of depression with associated symptoms of some tangential association at times, a very subdued quiet feeling, and feelings of isolation, he failed to acknowledge her diagnosis of PTSD, her random

19

suicidal thoughts, and her history of hallucinations.  And nowhere did he give an opinion as to the aggregate impact of those symptoms.  The ALJ's failure to consider the full impact of Lopez's severe and non-severe impairments is another reason why this case must be remanded for further proceedings.  *See Denton*, 596 F.3d at 423; *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

The ALJ's lack of a credibility assessment is one more reason why the RFC finding cannot stand.  Lopez argues that the ALJ erroneously discounted her description of her depression because she had limited mental health treatment and had never been hospitalized for depression.  (R. 21, Pl.'s Mem. at 17-18.)  An ALJ "'must not draw any inferences' about a claimant's condition from [infrequent treatment or failure to follow a treatment plan] unless the ALJ has explored the claimant's explanations as to the lack of medical care."  *Craft v Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (citation omitted).  That is because "mental illness in general . . . may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment."  *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006).  Here, the ALJ never questioned Lopez at the hearing about her mental health treatment, but in his decision he was skeptical about the severity of her symptoms because she had limited mental health treatment.  (A.R. 19.)  But before he used her lack of treatment against her, the ALJ was required to explore Lopez's reasons for her limited treatment.  *See Craft*, 539 F.3d at 679.  That error is compounded by the ALJ's recitation of the consistently criticized boilerplate statement that he rejected Lopez's symptoms "to the extent they are inconsistent

20

with the above [RFC] assessment." *See Bjornson*, 2012 WL 280736, at *4-5. As the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not "turns the credibility determination process on its head." *Brindisi ex. rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003). Here, the assessment of Lopez's ability to work necessarily hinges in large part on the credibility of her descriptions of the severity of her symptoms, and so the ALJ was required to factor her credibility into his assessment of the RFC, not use the RFC to determine her credibility. *See Bjornson*, 2012 WL 280736, at *4-5 (the ALJ's use of the much-maligned "template" casts doubt on whether he assessed the claimant's RFC before he assessed her credibility).

Because the ALJ has not sufficiently connected the dots between Lopez's impairments, supported by substantial evidence in the record, and the RFC assessment, a remand on this issue is warranted. *See Clifford*, 227 F.3d at 871 (an ALJ must consider "*all* relevant evidence" and may not analyze only that information supporting the ALJ's final conclusion (emphasis in original)); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable impairments . . . and may not dismiss a line of evidence contrary to the ruling.").[6]

_____

[6] In light of the ruling herein, the court does not need to reach the remainder of Lopez's arguments pertaining to the ALJ's errors in the RFC finding. Specifically, the court does not consider Lopez's contention that the ALJ made inappropriate assumptions that were not supported by the record and "played doctor" by inserting his opinion in place of the objective medical evidence. (R. 21, Pl.'s Mem. at 16-17.) Nor does the court need to consider Lopez's

## B.     Treating Physician Rule

Lopez next contends that the ALJ erroneously weighed the medical evidence because, according to her, he improperly credited the opinion of Dr. Kravitz over those of her treating physicians.  (R. 21, Pl.'s Mem. at 14-15.)  An ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) it "is not inconsistent with the other substantial evidence" in the case.  20 C.F.R. §§ 405.1527(d)(2), 416.927(d)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).  The treating physician rule does not apply here because Lopez has failed to identify any opinions from her physicians regarding her limitations or ability to perform work-related activities.  As the Commissioner points out, the medical record consists of clinic notes with no identifiable, consistent treating physician.  (R. 23, Def.'s Mem. at 13.)  And nowhere in any of those notes does a treating practitioner offer an opinion about Lopez's RFC or ability to work.  Because Lopez has not identified any treating physician's opinion, her argument under the treating physician rule is without merit.

## C.     Hypothetical Question

Lopez argues that the ALJ failed to propound a complete hypothetical question to Breen because he did not account for all of her limitations.  (R. 21, Pl.'s Mem. at 15-16.)  When an ALJ relies on testimony from a vocational expert, the "hypothetical question he

---

argument that the ALJ erred in concluding that limiting her to routine activities would compensate for her attentional or concentration difficulties.  (Id. at 16.)  The ALJ will necessarily revisit these issues in reassessing Lopez's RFC on remand.

poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Here, the ALJ proposed a hypothetical person to Breen who was limited to short and simple instructions, brief and superficial contacts with coworkers and supervisors, and ordinary levels of work stress. But as set forth above, the RFC from which the ALJ developed that hypothetical is flawed because it does not fully account for Lopez's limitations. Accordingly, on remand, after the ALJ reassesses Lopez's limitations, he must include those limitations in the hypothetical questions he poses to the vocational expert. Furthermore, to the extent Lopez claims that the ALJ did not incorporate Breen's recommendation that she can only work at night, the ALJ should clarify whether Lopez has any restrictions against contact with the general public and whether Breen meant that she is only capable of working at night or whether nighttime work would be preferable to daytime work.

## Conclusion

For the foregoing reasons, Lopez's motion for summary judgment is granted insofar as it requests a remand and the Commissioner's motion for summary judgment is denied.

**ENTER:**

_____
Young B. Kim
United States Magistrate Judge

23